IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01075-MEH

DANETTE MARIE SHERON,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

**ORDER**

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Danette Sheron appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **affirms** the ALJ's decision and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB benefits filed on August 29, 2012, alleging a disability caused by Asperger's Syndrome and an

anxiety disorder, with a disability onset date of August 21, 2012.  [AR 32, 138-39, 180]  Because

Plaintiff applied for DIB only, she had to establish that her disability began before her September

30, 2017, date last insured.  [AR 32]  After the application was initially denied on February 4, 2013

[AR 99-101], an Administrative Law Judge ("ALJ") held a hearing on September 25, 2013, upon

the Plaintiff's request [AR 46-88].  On November 14, 2013, the ALJ issued a written, unfavorable

decision, finding Plaintiff had not been disabled from the alleged date of the onset of disability

through the date she was last insured, because considering Plaintiff's age, education, work

experience and residual functional capacity ["RFC"], there were jobs existing in significant numbers

in the national economy that Plaintiff could perform.  [AR 29-45]  On March 24, 2015, the SSA

Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's

determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR

1-7]  *See* 20 C.F.R. § 404.981.  Plaintiff timely filed her Complaint with this Court seeking review

of the Commissioner's final decision.  [Docket #1]

## II.   Plaintiff's Alleged Mental Conditions

Plaintiff was born on December 30, 1985, and was 26 years old on the alleged onset date,

claiming disability due to an anxiety disorder, Asperger's Syndrome, and depression – problems

she had experienced since childhood.  [AR 138, 180, 205, 247, 294]  Plaintiff completed high

school, participating in band and drama club throughout her high school years; she later earned a

bachelor's degree (with a 3.0 grade point average) from Colorado State University, Pueblo. [AR

246-47] Plaintiff has past experience working in call centers and at fast food restaurants as a cashier

(working at McDonald's for more than two-and-a-half years [AR 247]), although the ALJ found

these jobs were not past *relevant* work because they required dealing with the public, which she had trouble doing because of the social problems caused by her impairments.  [AR 40, 53-55] Plaintiff's medical records involve both physical and mental issues; however, as Plaintiff's argument on appeal does not question the ALJ's handling of the physical problems, the Court will focus only the mental disorders.  *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those of [plaintiff's] contentions that have been adequately briefed for our review.")

Plaintiff's medical records involving her mental condition are presented in this record exclusively through documents from her treating psychiatrist, John Hardy, M.D., her doctor since late 2009. [AR 264] Records begin in the summer of 2011, with Plaintiff "still looking for work" but seeming to "be holding her own." [AR 245] By November 2011, the records show she had gotten a job at a call center, was in a good mood, and "seems much more confident than when she first came here." [AR 244] The doctor reported in January 2012 that she was working and doing "ok" on her medications.  [AR 243] In March 2012, she reported she "almost" had a panic attack at work and was "upset about the shifts." [AR 242] The doctor suggested she "continue to stretch her experiences outside her comfort zone." [*Id.*]   In April 2012, she discussed a relationship she had begun with someone; she also discussed her schedule change at work. [AR 241] In June 2012, she expressed being "demoralized" at work, and "she wept when [the doctor] acknowledged how difficult it is for her to day after day go back to the call center." [AR 240] By July 2012, she told the doctor she was "feeling burned out after seven months at the call center." [AR 239] The doctor noted her "previous experiences" make her "feel pessimistic and [make her] difficult to motivate." [*Id.*] The doctor suggested she "look at civil service/Fort Carson opportunities on the Internet," and "she

warmed slightly to the idea." [*Id.*]

On August 17, 2012, she met with the doctor, who noted Plaintiff had taken three weeks medical leave from work "due to headaches and stress." After returning to work, she reported to the doctor that she broke down crying at work; she later that same day saw Dr. Hardy, along with her mother, telling him her employer asked her to either resign or take a month off. [AR 237] Plaintiff's mother asked at the session if Plaintiff should apply for disability, indicating that Plaintiff's younger sister (who has autism) is on disability. [*Id.*] The doctor "tried to let her think about what she wants rather than mom deciding for her." [*Id.*] At Plaintiff's September 4, 2012 appointment, Dr. Hardy agreed she could no longer work at the call center, noting "I told her I think she made a heroic effort given her Asperger's and anxiety disorder of surviving as long as she did." [AR 236] He indicated her "concrete" thinking makes psychotherapy difficult at times; for example, she struggled to "visualize her perfect job." [*Id.*] When asked if she could manage a Game Stop store, she responded: "Well retail would mean part time and having to work too much over the holidays." [*Id.*] Also at this appointment, Plaintiff told the doctor she had applied for disability, and the doctor explained to her why an independent evaluation would be required beyond his opinion. [*Id.*]

After she stopped working, Plaintiff received unemployment benefits, applied for jobs, and volunteered at the library and the animal shelter. [AR 235, 284, 304] She also started dating and attended anime conventions. [AR 235, 284-85, 303, 310] Dr. Hardy continued to treat her at least through the middle of 2013, generally reporting the same characteristics as in previous sessions. [AR 300-304] At an April 2, 2013 session, Plaintiff expressed stress because her father "thinks she may jeopardize her disability if she actually secures a job." [AR 304] The doctor also indicated at that

4

appointment that Plaintiff's mood was "mildly dysphoric" and that she was "guarded," yet he said she had no thought disorder, while she also had intact memory and concentration, speech, and motor function. [*Id.*]

## III.   Medical Opinion Evidence

A.   Carlos Rodriguez, Ph.D.– SSA Consultative Evaluator

On January 15, 2013, Dr. Rodriguez, a psychologist, evaluated Plaintiff at the request of the SSA. [AR 246[   He both reviewed Dr. Hardy's medical notes and conducted an interview and detailed mental status examination of Plaintiff. [*Id.*] Plaintiff reported to Dr. Rodriguez that, since childhood, she has had "difficulty with social relationships" and "a history of depression." [AR 247] She told the doctor she "has had an enduring interest in video games since the age of 4 and adds that she currently plays video games eight hours a day, describing herself as 'addicted.'" [*Id.*] She also reported feeling anxious about her future ability to work and provide for herself, feelings that sometimes lead to agitation and cause her to have difficulty breathing. [*Id.*] She told the doctor she "would be interested in job training as an administrative assistant." [*Id.*] Dr. Rodriguez concluded:

> [Plaintiff's] ability to engage in sustained concentration, memory, persistence and pace and social interaction are significantly impaired due to her psychopathology and her performance on the mini-mental status examination.  Her ability to adapt to work changes is severely impaired due to her psychopathology and cognitive deficits.  Her ability to engage in understanding of work-related activities is moderately impaired due to her psychopathology and her cognitive deficits.

[AR 249]

B.   Douglas Hanze, Ph.D. – SSA Consultative Evaluator

In February 2013, Dr. Hanze provided a consultative review of the record, including Dr.

Rodriguez's report, and concluded Plaintiff could work as long as the work had limited social contact. [AR 92-94] His report explained that Plaintiff has full activities of daily living "except for social problems." [AR 94] He noted Plaintiff volunteers at an animal shelter, worked for more than two years in high school at one job, has a college degree, and "appears capable of work with limited social contact" as she has "social anxiety and a diagnosis of Asperger's." [*Id.*]

C.      John Hardy, M.D. – Treating Physician Opinion

Dr. Hardy first explained in a letter dated November 28, 2012, that he had treated Plaintiff from October 2009 to April 2, 2013, meeting with her usually each month for Plaintiff's depression anxiety disorder, and Asperger's Syndrome and later found that she "is clinically stable but requires ongoing treatment." [AR 273] He also at that time completed a medical form, labeling Plaintiff "disabled" with a date of onset at "birth." [AR 274] Dr. Hardy then in April 2013 completed a Psychiatric/Psychological Impairment Questionnaire regarding Plaintiff. [AR 264-71] He again noted his diagnosis of Plaintiff having Asperger's Syndrome, an anxiety disorder, and depression, indicating that she was unlikely to improve further based upon his continuous treatment of her during the prior more than three years. [AR 264] He opined that Plaintiff would have significant impairment in her ability to sustain concentration, memory, persistence, pace, and social interactions; meanwhile, he noted a severely impaired ability to adapt to work changes, and a moderately to severely impaired ability to understand work-related activities.  [AR 248-49] He explained Plaintiff has "rumination and pathological anxiety related to social interactions, recurrent panic attacks, and decompensations when socially stressed," further noting "she often would have to leave work or would struggle to remain at work at previous position." [AR 266] Dr. Hardy

6

assigned Plaintiff a GAF score of 50[1],  concluding Plaintiff would be "capable of low stress" in a

_____

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR

work situation. [AR 270]

In a letter dated June 14, 2013, Dr. Hardy provided his opinion in response to a letter from her attorney who was representing her in her disability claim. [AR 272] The letter reads:

> [Plaintiff] has suffered from Asperger's disorder since childhood.  She presented to me in 2009.  At that time she had already lost two jobs due to the anxiety which her condition caused her in the work arena.  She has tried heroically over the years to maintain employment despite repeated panic attacks and depressive episodes.  I believe she has truly been disabled since her presentation akin to an individual who continues to labor with a severe back injury.  My timing of her disability thus reflects her effort to attempt to maintain employment with a condition that caused her considerable suffering.

[*Id.*]

## IV.     Hearing Testimony

The ALJ held a hearing on September 25, 2013, at which her attorney had the opportunity to question her.  [AR 46-88] She testified that her depression makes her feel "bummed out," [AR 56]; she has panic attacks that make her cry, stop breathing, and at times faint [AR 58]; and she gets anxious even when looking for jobs [AR 59].  She explained that she spends time volunteering at an animal shelter once a week. [AR 52] On other days, she said she stays in her pajamas except to walk her dog. [AR 56] She sleeps sometimes 10-to-12 hours a day. [AR 71] She is able to follow recipes, such as baking cookies from scratch. [AR63] She also spends time playing video games. [AR 64]

Regarding her employment history, Plaintiff testified she used to work as a fast-food cashier.

―――――――――――――

persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

[AR 54-55] Most recently, she said she had worked in a call center, where she had difficulty talking to people on the phone, especially if they were confrontational with her.  [AR 53]  Plaintiff noted she believes she is unable to work because she cannot keep up with the pace of work. [*Id.*] She said she would try to work as an assembler if the job were offered to her [AR 68], but that she had problems getting jobs because she is nervous during interviews [AR 68-70].  She noted that her psychiatrist, Dr. Hardy, thought she could work a full-time job if it were low stress, which she defined as being "very low contact with the public" but could involve being around co-workers. [AR 73-74] She admitted she had not attempted to perform such work in the past. [AR 74] Plaintiff's attorney also gave Plaintiff's mother the opportunity to testify at the hearing. [AR 79-80] The mother indicated Plaintiff had covered "everything" about "all her difficulties that [Plaintiff] has." [AR 80]

A vocational expert ["VE"] testified at the hearing that Plaintiff's past relevant work included applications clerk, customer order representative, fast food representative, and sales representative on the telephone – all with light or sedentary exertional levels.  [AR 81]  The ALJ then gave the VE the following scenario:

> [A]ssume an individual, same age, education, work background as the claimant, with no exertional limitations.  However, nonexertionally, no dealing with the general public, occasional dealing with coworkers, and minimal supervision.  Would an individual with those limitations be able to do any of the past work of the claimant?

[AR 82] The VE said no. [*Id.*] However, when asked if other jobs would be compatible, the VE concluded that a person with those conditions could perform occupations that included a cook helper, a kitchen helper, or a dump truck driver.  [*Id.*]  The ALJ then asked the VE to consider the

following hypothetical:

> Assume the restrictions in the first hypothetical, with these modifications: a marked inability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; a marked inability to work in coordination with or proximity to others without being distracted by them; a marked inability to complete a normal work week without interruptions from psychologically-based symptoms.

[AR 83] The VE concluded that such inabilities would "preclude competitive employment." [*Id.*]

Plaintiff's lawyer then questioned the VE about the roles of cook helper and kitchen helper, suggesting that by their "helping" nature, they would involve constant instruction. [AR 84] The VE corrected that assumption regarding the cook helper position: "No, they're expected to work independently, not constant instruction.  The jobs are considered very repetitive, and so they don't change very much.  They're basically working in a kitchen.  Washing dishes is a primary task." [*Id.*] Likewise, the VE noted a kitchen helper is focused on daily cleaning of the floors, "every single day," making the duties "routine."  [AR 86] The VE further testified that even if duties change "a little bit," the nature of each job is "repetitive." [*Id.*] The VE acknowledged to Plaintiff's counsel that if a person "has a severe impairment where they could not adapt to any work changes" and/or if the person "two-thirds of the day couldn't sustain concentration, memory, persistence, and pace," it would eliminate these jobs as possibilities. [AR 87]

The ALJ issued an unfavorable decision on November 14, 2013.  [AR 29-45]

## **LEGAL STANDARDS**

### I.    **SSA's Five-Step Process for Determining Disability**

Here, the Court will review the ALJ's application of the five-step sequential evaluation

process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See id.* If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed RFC prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five at which the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g).

## II.      Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

### ALJ's RULING

At Step One, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2017. [AR 34] The ALJ also found that the Plaintiff had not engaged in substantial gainful activity between August 21, 2012, and the alleged onset date of the same date. [AR 32, 34] At Step Two, the ALJ determined Plaintiff had the following severe

impairments: "Asperger's Disorder and Anxiety Disorder." [AR 34]  The ALJ also considered

evidence of recurring headaches but found that condition not to be severe because medication had

effectively treated the problem.  [AR 34-35]

At Step Three, the ALJ concluded Plaintiff did not have an impairment that met or equaled

the severity of one of the listed impairments. [AR 35] In making this conclusion, the ALJ

extensively cited to the record, including the following observations:

> In activities of daily living, the claimant only has mild limitations.  The claimant has
> no problems with her own personal care.  She is able to prepare simple meals, does
> laundry and cleaning, and picks up yard debris.  She shops for food and clothes.  She
> walks her dog every day and performs volunteer work weekly at the local animal
> shelter, where she walks other dogs.  She helps take care of her autistic sister.

> In social functioning, the claimant has moderate limitations.  The claimant alleged
> she had a constricted lifestyle with no friends and difficulty dealing with the public
> and co-workers.   She has reported difficulty with social relationships since
> childhood.  Her treating psychiatrist, Dr. Hardy, reports the claimant experiences
> anxiety related to social interactions and [] significant problems when socially
> stressed.  Dr. Hardy opined that the claimant had some moderate limitations and a
> couple of marked limitations in the social interaction categories.

> With regard to concentration, persistence or pace, the claimant has mild limitations.
> She is able to drive a car, has her driver's license, and goes out alone.  She pays bills,
> handles money, and handles her own savings and checking account.  She has handled
> her own checking account since the age of 16.  She watches TV, reads, and plays
> video games.  She reports being able to follow written and spoken instructions,
> although she sometimes requires repetition.

> Her treating psychiatrist reports that her memory and concentration is intact.  Dr.
> Rodriguez performed a consultative examination and screened the claimant for
> neurocognitive impairments.  The claimant scored a 26 out of 30 points, indicating
> no such impairments.

[AR 35-36 (extensive citations to the record omitted)] Thus, the ALJ found Plaintiff had the RFC

to "perform a full range of work at all exertional levels but with the following nonexertional

limitations: [she] should not deal with the general public, should only occasionally deal with co-workers, and should experience only minimal supervision." [AR 36] In making this finding, the ALJ provided detailed analysis, again with extensive citations to the record and commentary on Plaintiff's testimony, the medical record, and the opinions of the treating and consultative physicians. [*See* AR 36-40] The ALJ explained his reliance on the opinion of Dr. Hanze as follows:

> Douglas Hanze, Ph.D., reviewed the claimant's file on February 2, 2013. He concluded the claimant had activities of daily living that were only restricted by the claimant's social limitations. The claimant experiences social anxiety. He concluded that the claimant was capable of working in an atmosphere of limited social contact. Dr. Hanze found that the claimant could perform work of limited complexity, as long as it did not require working closely and with frequent and prolonged contact with supervisors and co-workers. This supports the RFC as stated above, that the claimant should not deal with the general public, should only occasionally deal with co-workers, and should work in an atmosphere of minimal supervision. The undersigned gives substantial weight to Dr. Hanze's opinion because it is consistent with the claimant's treatment records, her history of past employment, and her normal activities of daily living.

[AR 37]

In contrast, the ALJ gave no weight to the opinion of Dr. Rodriguez, who performed a psychological consultative examination on Plaintiff on one day – January 15, 2013. [AR 37-38] Dr. Rodriguez concluded Plaintiff had a GAF of 45, which the ALJ indicated "portends some serious symptoms" or "serious impairment in social, occupational, or school functioning." [AR 38] The ALJ concluded of this opinion:

> [A] GAF score is merely a snapshot. It represents the subjective opinion of one clinician, on one day, at a single point in time. The score may vary from day to day, time to time, and from one evaluator to another. Therefore, it is not created for use in litigation.

14

Moreover, a narrative that details the findings of the evaluator should support the raw numerical score.  An unaccompanied score, i.e., one without a narrative, does not accurately reflect the psychological constraints on an individual's ability to work.  The above GAF score is not supported by the claimant's medical records cited.  For these reasons, the ALJ gives considerably less weight to a specific GAF score than to the bulk of other, more convincing evidence.

The undersigned gives no weight to this doctor's opinion because this GAF score is contrary to the claimant's history of functioning.  Although the claimant does have problems with social interaction, she has a demonstrated work history and a higher education degree.  These achievements are contrary to someone who has a serious impairment in occupational or school functioning.  She has had Asperger's Disorder since her childhood.  The claimant reports that she has always been this way and her mother reports there have been no changes.  The claimant's treatment records do not demonstrate a worsening of her symptoms, such as would contribute to this low GAF score.

Moreover, Dr. Rodriguez's opinion appears to be heavily based on the claimant's subjective reporting.  Dr. Rodriguez's consultative examination also contains internal inconsistencies.

[AR 38]

The ALJ also explained his reasons for giving no weight to Dr. Hardy's opinion that Plaintiff was totally disabled, noting the determination of disability is an "ultimate administrative finding [] reserved to the Commissioner and to the Commissioner's delegated adjudicators." [AR 39] The ALJ did consider Dr. Hardy's other conclusions, as described in the opinion:

[The finding of disability] is solely within the province of the undersigned. However, the undersigned did carefully and fully consider Dr. Hardy's opinion, albeit, as that opinion has been bound within the sphere of the regulatory factors.  The opinion is not supported by the claimant's normal [activities of daily living], by her work history, and by the other medical evidence of record, including Dr. Hardy's own treatment records.  Despite Dr. Hardy's report that the claimant's limitations have existed since 2009, the claimant has worked at the substantial gainful activity level since 2009.

15

The claimant does have a history of serious problems with social functioning.  The claimant alleged she had a constricted lifestyle with no friends and difficulty dealing with the public and co-workers.  She has reported experiencing difficulty with social relationships since childhood.  Her treating psychiatrist, Dr. Hardy, reports the claimant experiences anxiety, related to social interactions, and  anxiety when encountering significant problems or when socially stressed.  The claimant's difficulty in this are support the limitations that the claimant should not deal with the general public, should only occasionally deal with co-workers, and should work in an atmosphere of minimal supervision.

Dr. Hardy's most recent treatment records, however, show that the claimant has improved.  She went from treatment once per month to only once every two months.  Dr. Hardy noted on June 5, 2013, that the claimant appeared less distressed and had achieved a modicum of social success.  The claimant began a dating relationship with a member of the opposite sex.  The Prozac has helped her and she exhibited no evidence of thought disorder and had normal concentration.  Dr. Hardy reports the claimant has been clinically stable, although still needing ongoing treatment.

The claimant does not have significant problems with regard to concentration, persistence, or pace.  She is able to drive a car, has her driver's license, and goes out alone.  She pays bills, handles money, and handles her own savings and checking account.  She watches TV, reads, and plays video games.  She reports being able to follow written and spoken instructions, although she sometimes requires repetition.  Dr. Hardy reports that her memory and concentration is intact. . . .

The undersigned notes the claimant received unemployment benefits well after the alleged onset of disability.  She received these benefits in the 4th quarter of 2012 and the 1st and 2nd quarters of 2013.  Presumably, she was available to accept work.  Dr. Hardy reports she was actively applying for work.  This also diminishes the claimant's credibility in asserting total disability.

[AR 39-40 (internal citations omitted)]

At Step Four, the ALJ determined Plaintiff did not have past relevant work, but that considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy, including cook helper, kitchen helper, or dump truck driver. [AR 40-41]  As a result, the ALJ concluded that Plaintiff was not disabled at Step

Five of the sequential process and, therefore, was not under a disability as defined by the SSA at any time from August 21, 2012, through November 14, 2013 (the date of the decision). [AR 41]

Plaintiff sought review of the ALJ's decision by the Appeals Council on December 3, 2013 [AR 27], which was denied on March 24, 2015 [AR 1-7]. Plaintiff timely filed her Complaint in this matter on May 21, 2015. [Docket #1]

## ANALYSIS

On appeal, Plaintiff asserts that the ALJ erred in improperly (1) weighing the medical opinion evidence, and (2) evaluating Plaintiff's credibility. Opening Brief, docket #15 at 7, 14. Thus, Plaintiff argues the disability denial is not based on substantial evidence. *Id.*

## I.     Weight Given to Medical Opinions

Plaintiff essentially argues the ALJ erred in giving varying weight to different doctors and not giving controlling weight to a treating physician. *Id*. at 8-13. Defendant responds that the ALJ explained the reasons he gave varying weight to the medical opinions, and those reasons were consistent with the medical record, meaning the ALJ's conclusions should not be disturbed on review. Response, docket #16 at 8-15.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)). The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted). The applicable regulations governing the SSA's consideration

of medical opinions distinguish among "treating" physicians, "examining" physicians and "nonexamining" (or "consulting") physicians. *See* 20 C.F.R. § 416.927(c).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. If the opinion is not supported by medically acceptable evidence, then the inquiry at this stage is complete. *Watkins*, 350 F.3d at 1300. However, if the ALJ "finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record ." *Id*. If not, the opinion is not entitled to controlling weight. *Id*. In contrast, if the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must move to step two and consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Id*. "An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is

'based on an evaluation of all of the factors set out in the cited regulations' and if he provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo*, 682 F.3d at 1291).

It is error for an ALJ not to adequately state and explain what weight he or she gives to medical opinions. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ must give "good reasons" for the weight he or she ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301. The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Even though an ALJ is not required to discuss every piece of evidence, it must be clear that the ALJ considered all of the evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's notes. *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

As outlined thoroughly in the discussion above regarding the ALJ's opinion, the ALJ provided detailed explanations of the weight he assigned the medical opinions. He gave no weight to the opinions of both Dr. Rodriguez (who performed a one-time psychological consultative examination of Plaintiff on behalf of the SSA) or Dr. Hardy (who was Plaintiff's treating psychiatrist for many years). [AR 39-39] Meanwhile, the ALJ gave substantial weight to the opinion of Dr.

Hanze (a non-examining state agency psychologist). [AR 37] Plaintiff argues the ALJ failed to give good reasons for his assignment of weight, and deference should have been given particularly to Dr. Hardy's opinion. Opening Brief, docket #15 at 8, 13.  Defendant counters that the ALJ provided an exhaustive review of the record, detailing specific citations that explained his reasoning, including questioning inconsistencies between Dr. Hardy's treatment notes and his conclusions, as detailed above.  Response, docket #16 at 8-10.  Defendant also points out the ALJ correctly found that Plaintiff's activities of daily living and substantial gainful activity in the past belied her claims of disability as she had Asperger's Disorder and Anxiety Disorder long before claiming disability.  *Id*. at 12-14.

The ALJ noted his reliance on the opinion of Dr. Hanze and his reasons for giving that opinion substantial weight.  Specifically, the ALJ explained that Dr. Hanze's opinion was consistent with the claimant's treatment records, her history of past employment, and her normal activities of daily living. [AR 37] The ALJ also provided detailed reasoning behind his decision to give no weight to the opinion of Dr. Rodriguez, who examined Plaintiff on behalf of the SSA on one day only.  The ALJ found Dr. Rodriguez's GAF score of Plaintiff to be questionable when viewed in light of her activities of daily living as well as her employment history. Furthermore, the ALJ noted that this opinion did not include a narrative and was not supported by the Plaintiff's medical records. Finally, the ALJ adequately explained his reasons for giving no weight to Dr. Hardy, Plaintiff's treating physician, in particular that Dr. Hardy's conclusion as to Plaintiff being disabled was not aligned with his treatment records nor with Plaintiff's work history and activities of daily living.

The Court's review of the record in its entirety and its review of the ALJ's opinion shows

the ALJ properly conducted a thorough analysis based on substantial evidence and, as such, the opinion should not be disturbed on appeal.

## II.  Plaintiff's Credibility

Plaintiff asserts the ALJ erred by failing to properly evaluate Plaintiff's credibility.  Opening Brief, docket #15 at 14-16.  Defendant argues the ALJ reasonably found Plaintiff not fully credible and gave sufficient reasons for that decision.  Response, docket #16 at 15-17.

When determining whether the claimant's reporting of her conditions is credible, the ALJ must consider assertions and decide whether the ALJ believed them.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  To do this, the ALJ should consider factors such as:

> levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id*.  The ALJ should give a conclusion and the reasons for that conclusion, explaining "why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible," affirmatively linking credibility findings to substantial evidence in the record.  *Id*.  Further, because credibility determinations are within the province of the ALJ, a reviewing court may not upset such findings where they are supported by substantial evidence.  *See Quantu v. Barnhart*, 72 F. App'x 807, 835 (10th Cir. 2003).

Once objective medical evidence shows that a claimant has an impairment that can reasonably be expected to produce symptoms, the ALJ is required to consider the claimant's

21

assertions of the symptoms and decide whether to believe them.  *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993).  "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990); *see also Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

While Plaintiff asserts that the ALJ did not sufficiently link his opinion to the record, the Court's review of the ALJ's decision shows the ALJ followed the required approach.  The ALJ rejected Plaintiff's complaints in part because he did not find them fully credible, particularly in light of Plaintiff's activities of daily living and testimony at the hearing.  The ALJ noted, for example, that Plaintiff had experienced these medical conditions since childhood, yet she had successfully graduated from college and held jobs in recent years.  She also despite claiming disability had recently engaged in weekly volunteer work at a local animal shelter.  Thus, the ALJ provided a substantial narrative explaining his decision, meeting the requirement that he "set forth the specific evidence he relied on in evaluating the claimant's credibility."  *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009).  Because the ALJ's reasons for discounting the Plaintiff's credibility are supported by the record, his determinations are entitled to substantial deference.  *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001); *see also Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  Therefore, on this record, the Court will not disturb the ALJ's opinion.

## <u>CONCLUSION</u>

In sum, the Court concludes that the ALJ's opinion was based on substantial evidence, thus, the decision that Plaintiff Danette Sheron was not disabled is **affirmed**.

Dated at Denver, Colorado this 23rd day of February, 2016.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge